# EXHIBIT A

Federal Mediation and Conciliation Service

| | |
|---|---|
| In the Matter of The Arbitration Between: ) | Before Arbitrator James E. Rimmel |
| | |
| Cleveland Brothers Equipment Company   )<br>                                                            ) | FMCS #190204-03851 |
| and                             )<br>                                                            ) | Heard: 30 April 2019 RIDC Park, Pittsburgh,<br>PA |
| | )<br>The International Union of Operating            )<br>Engineers, Local 66, 66A, B, C, D, O, & R, )<br>AFL-CIO                            )<br>                                                            )<br>                                                            )<br>                                                            ) | Post hearing briefs rec'd: 21 June 2019<br><br>Issued: 20 July 2019 |

Appearances

For the Employer:
Douglas G. Smith
Jackson Lewis P.C.

For The Union
Joshua Bloom
Attorney at Law

Background

This grievance comes from a Field Technician (FT) at the Cleveland Brothers Equipment Company's Murrysville, Pennsylvania location who contends that the disciplinary suspension meted-out to him on 18 February 2019 for allegedly working under the influence of alcohol was for other than proper cause. A violation is alleged of Article 14 of the 2016/2019 Agreement (Agreement) between Cleveland Brothers Equipment Company (Employer or Cleveland) and the International Union of Operating Engineers, Local 66, AFL-CIO (Union). As filed on 19 February 2018, the grievance reads as follows:

> Unjustly Disciplined
> Brought back to work immediately, made while [sic] for all lost wages and benefits,
> and for last chance agreement, and any and all references to it, be removed from
> this file.

Now, the salient events leading to the filing of the afore-quoted grievance are, for the most part, undisputed; to wit: at 6:41 a.m. on 17 December 2018,                (grievant) left his Saltsburg, PA home for work. At the time, grievant was driving a Cleveland Brothers Equipment

1

Company 33,000-pound gross weight vehicle which he had taken home the previous evening. Roughly an hour and a half later, i.e.,7:11 a.m., grievant reportedly arrived at the Employer's Murrysville, Pennsylvania location. At approximately 8:00 a.m. that morning, grievant was notified he had been randomly selected to undergo an alcohol screening test.

Per the Company's practice, grievant was sent to a nearby MedExpress facility for testing, a facility located at 4620 William Penn Highway, Murrysville, Pennsylvania, just across the highway from Cleveland Brothers Equipment Company's location. There he was given a Breath Alcohol Test (BAT), registering results of 0.34 (first test) and 0.029 (second test). The respective tests were administered sixteen (16) minutes apart with the testing equipment being recalibrated between tests in accordance with established testing procedures. There are no contentions of record that the BATs were improperly conducted or otherwise defective. Nor has any question been raised herein about grievant being selected for testing under a random selection procedure,[1] as such is provided for under Cleveland's Drug-Free Workplace Policy (Policy).[2]

Two (2) days later, grievant and his supervisor, John Hanson (Hanson) signed off[3] on a Rehabilitation Agreement (RA) which required, among other things, that grievant "enroll in a rehabilitation program" for "alcoholic treatment." The 19 December 2018 RA read as follows:

> On this day, December 19, 2018, Cleveland Brothers Equipment Company, Inc. (Cleveland Brothers), in addition to any discipline Cleveland Brothers may impose and as a condition of any continued employment, agreed that I seek an assessment and/or rehabilitation for alcohol and/or drug abuse, as required by my treatment provider. The following conditions apply to my rehabilitation agreement:
>
> 1.    I authorize my treatment provider to submit on a scheduled basis proof of enrollment in a rehabilitation program and proof of attendance to Cleveland Brothers' Human Resources Department. I understand that my attendance will be monitored closely and that Cleveland Brothers may institute disciplinary procedures up to and including termination of employment if I do not regularly attend all sessions.
> 2.    I must adhere to all of the requirements of the drug and alcohol treatment program in which I am enrolled.

[1] It has been long-recognized that random drug/alcohol testing for safety purposes is an appropriate concern when the employer has a particularly safety-sensitive operation. See *Day & Zimmermann,* 94 LA 399 (Nicholas, 1990).
[2] At Article 18, Section 8 of the CBA, the reasonableness of the Drug-Free Workplace Policy is recognized by the parties. The various provisions of this Policy itself were not specifically negotiated by the parties.
[3] Grievant reportedly signed the RA under protest being allegedly told that he would be terminated if he failed to do so.

3.    If I am absent from work during the rehabilitation period, Cleveland Brothers will review the reasons for the absence(s) and may require documentation, as appropriate.

4.    Upon completion of the rehabilitation program, I understand that I will be required to supply Cleveland Brothers with a statement from my treatment provider that I have completed that rehabilitation program in a satisfactory manner.

5.    During the treatment period and the two-year period following the completion of the assessment or rehabilitation program, I agree to submit to unannounced testing for the illegal use of drugs and I agree to submit to alcohol testing. Any positive test result in violation of Cleveland Brothers' Drug and Alcohol Abuse Policy will result on immediate termination of employment.

6.    I will comply with all other work rules and policies of Cleveland Brothers. I understand that my failure to do so will result on disciplinary action up to and including my termination from employment.

o

I hereby agree to all of the above conditions. This agreement does not alter my at-will employment status for non-bargaining employees or modify the Labor Agreement for bargaining employees or create a binding employment contract or modify any existing contract.

The subject grievance ensued!

<u>Employer Position</u>

The Employer argues that due to the scope and nature of its' business, i.e., renting, selling and maintaining heavy equipment, the safety of its employees and the public are of the utmost importance. To facilitate safety compliance, the Employer implemented its Policy which provides in pertinent part "[e]mployees subject to DOT/FMCSA[4] shall comply with all applicable requirements in addition to those listed in this policy and may be subject to additional testing requirements." DOT Compliance Manager, Bill Doane (Doane), testified during the hearing that due to the size of grievant's truck, he was subject to both DOT/FMCSA requirements in addition to any other requirements set forth in the Policy. The Policy further clarifies that a positive test will result in disciplinary action, up to and including termination. Under certain circumstances, an employee may retain his/her employment subject to the terms and conditions of a RA.

The Employer emphasizes that those employees subject to DOT/FMCSA regulations are provided detailed training explaining the requirements. Grievant attended such training in

---

[4] Department of Transportation (DOT) / Federal Motor Carrier Safety Administration (FMCSA).

January of 2014 and again in March of 2018. Of note, the 2018 training contained a PowerPoint presentation with one slide specifically highlighting DOT/FMCSA Regulation 392.5(a)(2) which states that no driver shall "have any measured alcohol concentration or detected presence of alcohol, while on duty, or operating, or in physical control of a commercial motor vehicle." Indeed, Cleveland stresses that this regulation was covered in both sessions. There is no evidence of record indicating that grievant did not attend or misunderstood the afore-mentioned training.

The Employer alleges that the DOT/FMCSA Regulation 392.5(a)(2) mandates a "zero tolerance" policy prohibiting the presence of any alcohol while operating a DOT/FMCSA regulated vehicle. Consequently, the Employer argues that the Union is, in essence, asking that I ignore the parties' Agreement, Company Policy, and DOT/FMCSA regulations. The Employer highlights that even Union witness Curt Bowser (Bowser) agreed, on cross-examination, that it would be a violation of federal regulations for the Company not to enforce the zero-tolerance policy for DOT regulated drivers.

The Employer draws my attention to arbitral law and relies on the analysis set forth by Arbitrator Caroll R. Dougherty in Enterprise Wine Co., 47 LA 359 (LA 1966) for determining whether a company had just cause to issue discipline. The Employer addresses all seven (7) criteria in turn and thereafter concludes that just cause existed for the meted-out discipline. Specifically, the Employer asserts that: (1) grievant was informed of his obligations and the potential consequences for failing to adhere to those requirements by virtue of its Policy and the training provided to grievant directly related to same; (2) the zero-tolerance policy is reasonably related to promote efficient and safe operations by preventing impaired drivers from operating DOT/FMCSA regulated vehicles on public roadways; (3) it did a thorough investigation prior to issuing discipline since grievant tested positive on a BAT administered by a neutral third party, was verified by a second test after recalibration, and grievant admitted immediately after the test that he "blew the alcohol test"; (4) the investigation was thorough and fair per the above facts; (5) there is no dispute that the investigation resulted in a finding that grievant had violated Company policy; (6) there is no evidence that the rules, orders or penalties imposed were not applied even-handily; and (7) the penalty imposed was related to the seriousness of the offense as the Policy clearly states that a first violation will result in discipline, up to and including termination.

Based on the above, the Employer requests that I deny the grievance in its entirety.

Union Position

The Union does not dispute the salient facts at issue but argues that discipline was not warranted because the Employer's Policy expressly provides for an exception for the moderate use of alcohol off Company property as long as the employee is not "under the influence," which the Policy defines as a Breath Alcohol Concentration (BAC) above .04.  Specifically, the Union highlights the following language contained in the Policy:

> **Exclusions:** The moderate use of alcohol at approved functions, off the premises or in conjunction with customer business meals, travel, or entertainment, is not prohibited by this policy. Any exception to this requires the prior approval of a corporate officer.

> Exclusions do not permit an employee to be 'under the influence' of alcohol under any circumstance, nor do they allow for consumption by underage persons. 'Under the influence' is defined as blood alcohol level in excess of 0.04.

The Union stresses that this "exclusions provision" immediately follows the language regarding DOT/FMCSA regulated employees.  Hence, the Union argues that the only plausible explanation is that the exceptions stated therein apply to all employees, including those that may be regulated by DOT/FMSCA regulations.  Here, since the Employer has produced no evidence that grievant ever tested above a BAC level of .04, the Union argues that discipline of any sort was improper and without just cause.

Further, the Union argues that an employee must have notice that his or her conduct violates Company policy before discipline can be imposed. The Union contends that this is not simply a case where the Company merely failed to inform the employee of the prohibited conduct.  Instead, the Union views this as a case wherein the Company's own policy expressly excludes the grievant's conduct as being punishable under the Policy.

The Union further contends that it was not until the hearing that the Company decided to rely on the DOT regulations as justification for the meted-out discipline.  According to the Union, the Company's Human Resources Manager, Debbie Zundel (Zundel), admitted that grievant's conduct did not violate the Company's Policy.  Moreover, the documentation sent in response to the Union's information request did not state anything regarding DOT regulations.

Lastly, the Union argues, in the alternative, that should just cause be found, then discipline must be progressive as provided for in the parties' Agreement. Grievant was a twenty-nine (29) year employee with no prior disciplinary history. According to the Union, a two (2) month suspension with a last chance agreement was excessive given grievant's lengthy and productive employment, especially in light of a Policy that is expressly misleading.

Based on the above, the Union requests that I sustain the grievance and order back pay, all lost benefits, and removal of any reference to the RA from grievant's record. In addition, the Union requests I order the Company to cease and desist from violating its own Drug Free Workplace Policy and/or require the Company to redraft same in clearer terms.

<u>Relevant Contract/Policy Provisions</u>[5]

## ARTICLE 14 - DISCIPLINE

Section 1: When the Company feels disciplinary action is warranted, such action must be initiated within 5 working days from the actual date of the occurrence, or within 5 working days of the date the Company becomes aware of the occurrence of the condition(s) giving rise to the action. In no case will the Company initiate disciplinary action after 6 months has expired from the date of the occurrence. In no way does this limitation apply to any information already in the Employee's personnel folder. <u>A copy of the</u> written notification of the disciplinary action taken shall be given to the Employee and the Steward within 3 working days of the disciplinary action taken. <u>Discipline is normally progressive. Documentation on verbal warning will not be used for purposes of progressive discipline of there have been no infractions for a year or longer, unless there is a subsequent infraction similar to a previous infraction.</u>

## ARTICLE 18 - SAFETY

Section 8: **Drug Free Workplace:** To assist in meeting safety objectives, the Company's Drug-Free Workplace Program provides reasonable measures to ensure that an Employee drug and alcohol problem does not jeopardize the successful operation of the business or otherwise negatively affect the company, its Employees, the Union, our customers, or the general public. All <u>Bargaining Unit</u> Employees are subject to the terms and provisions of this policy as described in the Cleveland Brothers Equipment Company, Inc., Drug-Free Workplace Program Handbook and associated Drug-Free Workplace Summary. Copies of these documents are available through the Human Resources Department.

---

[5] <u>Underscoring</u> in original documents.

## ARTICLE 19 – MANAGEMENT RIGHTS

The Management of the plant and direction of the working forces, including but not limited to the right to hire, suspend, discharge for proper cause, transfer or relieve Employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Company, provided only that this will not be used for the purpose of discrimination against any Employees by reason of membership in the Union. All above subject to the provisions of this Agreement.

## DRUG FREE WORPLACE POLICY

**Drug and Alcohol Testing:** The company maintains the right to test any employee for drug and/or alcohol abuse, as permitted by federal or state law. Employees may be asked to submit to a random urine, saliva, blood, breath, and/or hair testing for drugs and alcohol. Blood tests may be used for post-accident, reasonable suspicion and prior to return-to-duty after a previous positive result. Any information obtained through such examinations may be retained by the Company and is property of the Company. Specifically, the Company reserves the right, within the limits of federal and state laws, to examine and test for the presence of drugs and alcohol in situations such as but not limited to, the following:

*   *   *

**Random:** For the added safety and health of Company employees, as well as the direct impact on Company profitability, image, and reputation, any Company employee may be subjected to random drug and alcohol testing. This included corporate and divisional officers, part-time and seasonal employees, and full-time positions.

Due to the potentially dangerous nature of work involving public safety or the safety of others performed by certain employees, any Company employee assigned to a safety-sensitive position, wither permanently or temporarily, can be subjected to random drug testing. This ensures the added safety and health benefits of all employees within the Company, as well as public safety. This includes corporate and divisional officers, part-time and seasonal employees, and full-time positions.

*   *   *

**DOT/FMCSA:** Employees subject to DOT/FMCSA shall comply with all applicable requirements in addition to those listed in this policy and may be subject to additional testing requirements.

*   *   *

**Exclusions:**

The moderate use of alcohol at approved functions, off the premises or in conjunction with customer business meals, travel, or entertainment, is not prohibited by this policy. Any exception to this requires the prior approval of a corporate officer.

Exclusions do not permit an employee to be 'under the influence' of alcohol under any circumstance, nor do they allow for consumption by underage persons. 'Under the influence' is defined as blood alcohol level in excess of 0.04.

Based on the exclusions above, if a situation occurs where an employee believes that he or she may be 'under the influence' of alcohol, the employee is not permitted to drive a vehicle, or return to work.

Issue

Did the Employer have proper cause to suspend grievant as a result of his positive alcohol test(s) on 18 December 2018? If not, what shall be the remedy?

Opinion

I begin my analysis in this case with the realization that both parties acknowledge that safety is paramount and wish to provide a safe workplace for all employees and the public. It is in this context that Cleveland implemented its Drug-Free Workplace Policy. Since Cleveland employs drivers subject to DOT/FMCSA regulations, the Policy is governed/guided by federal regulations. To understand the scope and reach of the Policy (and consequently whether grievant's conduct violated the terms of the Policy), I must examine applicable federal regulations, the language contained in the Policy, and any other evidence of import to the issue at bar.

Beginning with the applicable DOT/FMCSA regulations, DOT/FMCSA Regulation 392.5(a)(2) states that no driver shall: "[u]se alcohol, be under the influence of alcohol, or have any measured alcohol concentration or detected presence of alcohol while on duty, or operating, or in physical control of a commercial motor vehicle." It is this provision upon which Cleveland relies to establish proper cause because grievant tested positive for alcohol on the day in question, thus having a "measured alcohol concentration or detected presence of alcohol while on duty." In conjunction therewith, however, DOT/FMCSA Regulation 382.601 establishes guidelines for an employer's drug and alcohol program stating in pertinent part:

(a) General requirements.  Each employer shall provide educational materials that explain the requirements of this part and the employer's policies and procedures with respect to meeting these requirements.

*          *          *

(b) Required content.  The materials to be made available to drivers shall include detailed discussion of at least the following:

(10) The consequences for drivers found to have an alcohol concentration of 0.02 or greater but less than 0.04; Code of Federal Regulations 187.

In attempted compliance with this regulation, Cleveland provides its employees with training and instruction relative to its' Policy.  Importantly, the training provides employees with examples illustrating the correct interpretation of certain DOT/FMCSA regulations.  The purpose of the illustration(s) is to provide guidance to employees as to how certain regulations should be interpreted.  Question No. 4 addresses the topic presented in Regulation 382.601(b)(10) and inquired as follows:

Would an alcohol test, performed by an employer pursuant to 49 CFR part 382, with a result greater than 0.00 BAC, but less than 0.02 BAC, establish that a driver in was in violation of 49 CFR 392.5(a)(2), having any measured alcohol concentration while on duty?

The guidance provided responded:

No.  The Federal Highway Administration (FHWA) believes that 0.02 BAC is the lowest level at which a scientifically accurate breadth/blood alcohol concentration can be measured in an employer-based test under part 382.  The FHWA further believes that this use of a 0.02 BAC standard is consistent with FHWA's long established zero tolerance standard for alcohol.  This guidance in no way impedes or precludes any action taken by a law enforcement official because of a finding that a BAC level was less than 0.02 BAC.[6]

Hence, FHWA guidance establishes that a BAC level between 0.00 to 0.02 is NOT a violation of Regulation 392.5(a)(2).  Since this information is provided to employees by the Employer, it is fair to conclude the Cleveland instructs its' employees that a BAC level between

---

[6] From a strict constructionist standpoint, the proposed training/guidance does not entirely comport with the requirements of Regulation 382.601(b)(10), which requires that employees be informed of the consequences for drivers found to have an alcohol concentration of 0.02 or greater but less than 0.04.  The guidance instead outlines the FHWA's position as to whether a BAC level of 0.00 to 0.02 violates Regulation 49 CFR 392.5(a)(2).  The guidance does not address situations involving a BAC reading between 0.02 to 0.04.

0.00 and 0.02 are not impermissible under federal regulations and its' Policy. Thus, Cleveland's position at the hearing that any presence of alcohol in grievant's system on the day in question was in violation of the Policy is not supported by FHWA guidance or the training Cleveland provided its' employees.

Nevertheless, it is undisputed here that grievant registered 0.34 BAC (first test) and 0.029 BAC (second test), both of which exceed the 0.02 BAC threshold level to be considered in violation of DOT/FMCSA Regulation 392.5(a)(2). Therefore, via empirical evidence, it is clear that grievant was in violation of Regulation 392.5(a)(2) because he registered above 0.02 on the date in question.

That does not end my inquiry, however, because the regulations and training provided relative to same must be viewed in concert with the language chosen by Cleveland in its' Policy. The Policy provides for drug and alcohol testing, including post job offer, random, post-accident, and reasonable suspicion-based testing. The Policy itself does not call out specific DOT/FMCSA regulations but rather provides in more general fashion:

> **DOT/FMCSA:** Employees subject to DOT/FMCSA shall comply with all applicable requirements in addition to those listed in this policy and may be subject to additional testing requirements.

This language purports to establish expectations with regard to employees' subject to DOT/FMCSA regulations, indicating that such employees shall comply with all applicable DOT/FMCSA regulations, in addition to any other requirements listed in the Policy. Importantly, though, the Policy contains an "exclusions clause" which is located immediately after the above cited provision referring to DOT/FMCSA regulated employees. The "exclusions clause" reads as follows:

> **Exclusions:**
> The moderate use of alcohol at approved functions, off the premises or in conjunction with customer business meals, travel, or entertainment, is not prohibited by this policy. Any exception to this requires the prior approval of a corporate officer.
>
> Exclusions do not permit an employee to be 'under the influence' of alcohol under any circumstance, nor do they allow for consumption by underage persons. 'Under the influence' is defined as blood alcohol level in excess of 0.04.

> Based on the <u>exclusions</u> above, if a situation occurs where an employee believes that he or she may be 'under the influence' of alcohol, the employee is not permitted to drive a vehicle, or return to work.

By the clear language chosen by Cleveland, then, the Policy precludes employees from being "under the influence" and defines "under the influence" as a BAC level higher than 0.04. Due to the location of the "exclusions provision," namely immediately following reference to DOT/FMSCA regulated employees, the Union argues that a BAC level of 0.04 is the applicable standard for all employees.

The Union's argument is not without merit.  On the one hand, by referencing the DOT/FMCSA regulations in general terms, Cleveland appears to be mandating compliance with all applicable DOT/FMCSA regulations for those subject to such regulations. On the other hand, immediately following this language, Cleveland sets forth an exception prohibiting employees from being "under the influence" and therein defines "under the influence" as a BAC above 0.04. One possible interpretation is that Cleveland is attempting to set forth two (2) separate standards dependent upon the employee's regulated or non-regulated status. For example, it appears Cleveland seeks to maintain separate standards for DOT/FMCSA regulated employees versus non-regulated employees.  In other words, the Policy mandates that DOT/FMCSA regulated employees may not register above 0.02 BAC, while employees not subject to DOT/FMCSA regulations may not register above 0.04 BAC.

While the existence of two (2) separate standards is by no means mutually exclusive, the problem here is that Cleveland's Policy is ambiguous[7] in this regard.  It is simply not articulated clearly that such is the intent underlying the Policy.  The ambiguity falls on the shoulders of the drafter of the Policy.[8]  Quite simply, Cleveland could have inserted language that the "exclusions provision" does not apply to DOT/FMSCA regulated employees and/or that DOT/FMCSA regulated employees are held to a higher standard than that those set forth for non-regulated employees.  Such language would have removed all ambiguity and ensured that Cleveland's expectations as to all of its' employees were clearly articulated and easily understood.

---

[7] See *City of Highland Park,* 76 LA 811 (McDonald, 1981) stating that contract language is ambiguous "if plausible contentions can be made for conflicting interpretations."
[8] It was under the provisions of Article 18, Section 8 that the parties expressly recognized the Employer's right to issue a Drug and Alcohol policy, the language of such being developed by Management.

Due to the ambiguity within the current Policy, it is not unreasonable to conclude that an average employee would have difficulty reconciling which standard applies to whom and when. An employee cannot be disciplined for engaging in conduct that s/he does not know is improper. To find proper cause, the employer must, first and foremost, prove that the employee was aware of the prohibited conduct. Fundamental fairness necessitates that employees be informed of what constitutes prohibited conduct before discipline can be meted-out for failure to adhere to such conduct.

In conclusion, I find that Cleveland's Policy is ambiguous as to what BAC level is acceptable for which class of employee. By placing the "exclusions provision" immediately following language generally incorporating DOT/FMCSA requirements for a certain class of employees, it is unclear whether the prohibited BAC level is 0.02 or 0.04 and/or to which class of employee each separate standard may apply. The ambiguity is only further highlighted by the fact that simple clarifying language could have been added setting forth the Policy's intent and Cleveland's expectations as to its employees. Moreover, the training provided by Cleveland does not provide additional color or clarification to the issue. The training is limited to providing guidance that a BAC level between 0.00 and 0.02 does not equate to a violation of DOT/FMSCA Regulation 392.5(a)(2). No evidence was proffered showing that the training informed employees as to the consequences of a BAC reading between 0.02 and 0.04 (as required by Regulation 382.601(b)(10)), or discussed in any cogent fashion the Policy's definition of "under the influence" as exceeding a BAC of 0.04. Under these circumstances, I am left to conclude that Cleveland did not have proper cause for the meted-out discipline because the inherent ambiguity in the Policy did not adequately inform grievant as to what level of alcohol body content was deemed acceptable. Subject to varying interpretations, it is not fair to impose upon grievant the onus of reconciling the ambiguity in the Policy. Simply put, had Cleveland desired to establish two (2) separate standards, one for DOT/FMCSA regulated employees and another for non-regulated employees, then it was incumbent upon Cleveland to clearly set forth such in its Policy and/or training.

Accordingly, I find that this grievance must be sustained.

## AWARD

Based on the foregoing, the grievance is sustained.  Consistent therewith, the Employer is ordered[9] to:

(1) make grievant whole through payment of full back pay and lost benefits; and

(2) remove from greivant's personnel file any reference to the last chance agreement and his RA.

JAMES E. RIMMEL, Arbitrator

Page13

---

[9] While I have opted not to order the Employer to modify or re-draft its' Drug-Free Workplace Policy, assuming I had the right to do so, I recommend that it do so and thereby seek to remove the above discussed ambiguity.